**Steven McPEEK, Plaintiff,**

v.

**John D. ASHCROFT, et al., Defendants.**

**No. CIV.A. 00–201(RCL/JMF).**

United States District Court,
District of Columbia.

Aug. 1, 2001.

Debra Susan Katz, Ari Micha Wilkenfeld, Lisa Jean Banks, Bernabei & Katz, Washington, DC, for plaintiff.

Allison C. Giles, Carlotta P. Wells, U.S. Department of Justice, Washington, DC, for defendants.

### MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

#### The Lawsuit

Plaintiff, Steven McPeek, began working for the Bureau of Prisons ("BOP") on May 27, 1986. Complaint, ¶ 8. He insists that, upon his promotion to Assistant to the Director in 1990, then-Director of the BOP, J. Michael Quinlan ("Quinlan"), began to sexually harass him and did so for the next two years. *Id.* ¶¶ 9–19. Plaintiff then filed an informal complaint against Quinlan, with the Department of Justice ("DOJ") Equal Employment Opportunity Staff. The matter

was investigated and culminated in a Settlement Agreement on September 30, 1992. The agreement required that McPeek's complaints about Quinlan be kept confidential by both sides and that McPeek be transferred to the Management and Planning Staff ("MPS"), Justice Management Division ("JMD"), of DOJ. *Id.* ¶ 21. By 1994, plaintiff was working for the Justice Performance Review ("JPR"), under the Office of Policy Development and would ultimately become the Deputy Director of JPR, where he reported to Robert F. Diegelman ("Diegelman"), Director of MPS.

Plaintiff's complaint identifies two forms of retaliation. He first complains that, despite the confidentiality of the settlement agreement, his claims against Quinlan were known by the people with whom he worked and that he suffered humiliation and retaliation at their hands. He then complains that, after hiring counsel in July 1998 to pursue formal legal remedies beginning with EEO counseling, he suffered renewed retaliation efforts. *Id.* ¶¶ 58–74.

In responding to plaintiff's discovery, defendants have searched for electronic and paper documents. Since defendants have already searched for electronic records, they do not quarrel with their obligation to do so. During discovery, the producing party has an obligation to search available electronic systems for the information demanded. *See* Fed.R.Civ.P. 34(a) (document(s) include "data compilations from which information can be obtained"). Plaintiff, however, wants more. He wants to force DOJ to search its backup systems since they might yield, for example, data that was ultimately deleted by the user but was stored on the backup tape and remains there today.

Defendants protest that the remote possibility that such a search will yield relevant evidence cannot possibly justify the costs involved. In support of that claim, defendants submit the declaration of Billy Hoppis, Branch Chief within the JMD office responsible for technology services. Exhibit D to *Defendant's Opposition to Plaintiff's Motion to Compel.* Hoppis explains that for the period 1992–1998, the DOJ computer system was known as "Eagle." *Id.* ¶ 2. In 1998,

DOJ computers were briefly connected to a system called "JCON1." *Id.* From 1998 to the present, they have been connected to "JCON2." *Id.*

There was never a system-wide backup policy for Eagle servers. Each DOJ building had a server and an administrator who had his or her own backup policies. *Id.* ¶ 4. DOJ never intended a system which perfectly preserved all data. The purpose of having a backup system and retaining the tapes was to permit recovery from a disaster, not archival preservation. As a result, there are backup tapes for some periods of time but not others. Additionally, Hoppis explains:

> These backup tapes record only a "snapshot" of the contents of a user's working directory and emails (in the inbox, outbox, and trash) as of the specific date and time the backup was run, and therefore do not necessarily contain all emails sent or from a user, or all documents. In addition, unless a user deletes emails or documents between backups, each backup tape might contain many duplicate emails and documents that were captured on previous backup tapes.

*Id.* ¶ 12.

Finally, the backup tapes have to be "restored" or rendered readable by returning the files to a source (i.e., a disk or hard drive) from which they can be read by the application which originally created them. Then, someone would have to review the restored file, whether a word processing document or e-mail, and determine whether it falls within one of plaintiff's document requests. Hoppis estimates that using JCON2, the present operating system, merely restoring the e-mail from a single backup tape would take eight hours at a cost of no less than $93 per hour. *Id.* ¶¶ 14, 16.

### Analysis

Using traditional search methods to locate paper records in a digital world presents unique problems. In a traditional "paper" case, the producing party searches where she thinks appropriate for the documents requested under Fed.R.Civ.P. 34. She is aided by the fact that files are traditionally organized by subject or chronology ("chron"

files), such as all the files of a particular person, independent of subject. Backup tapes are by their nature indiscriminate. They capture all information at a given time and from a given server but do not catalogue it by subject matter.

Unlike a labeled file cabinet or paper files organized under an index, the collection of data by the backup tapes in this case was random. It must be remembered that the DOJ's use of a backup "synch" software system was not for the purpose of creating a perfect mirror image of each user's hard drive. Instead, the system was designed to prevent disaster, i.e., the destruction of all the data being produced on a given day if the network system crashed. Once the day ended and the system had not crashed, the system administrator could breathe a sigh of relief. She may then have maintained that day's backup tapes for some period of time, but then eventually taped over them. This explains why the tapes that remain today, ones which I ordered preserved, are tapes for certain days or periods of time but not for others and therefore not in perfect (or for that matter imperfect) chronological order.

It is therefore impossible to know in advance what is on these backup tapes. There is a theoretical possibility that there may be something on the tapes that is relevant to a claim or defense, for example, a subsequently deleted e-mail that might be evidence of a retaliatory motive. That possibility exists because other information establishes that the persons plaintiff claims retaliated against him used their computers for word processing and e-mail, and the backup tapes may have captured what those persons have since deleted from their computer files.

DOJ has chosen not to search these backup tapes and therefore runs the risk that the trial judge may give the jury an instruction that this failure to search permits the inference that the unfound files would contain information detrimental to DOJ.[1] Conversely, the trial judge may ultimately determine that an instruction should not be given, and therefore DOJ lacks any incentive to conduct a search. Given the potential costs involved, a defendant may be more than willing to decline to search the backup tapes and take the chance that either the court will not give such an instruction at trial, or that if such an instruction is given, defendant will still prevail. In any event, a substantial number of civil cases settle and discovery advances the prospects of settlement. Any potential advancement of settlement would be foregone if the defendant has the option of choosing not to do the search and there is good reason to think that information on the backup tapes' might induce one party or the other to settle.

There is certainly no controlling authority for the proposition that restoring all backup tapes is necessary in every case. The Federal Rules of Civil Procedure do not require such a search, and the handful of cases are idiosyncratic and provide little guidance.[2] The one judicial rationale that has emerged is that producing backup tapes is a cost of doing business in the computer age. *In re Brand Name Prescription Drugs*, 1995 WL 360526 at *3 (N.D.Ill., June 15, 1995). But, that assumes an alternative. It is impossible to walk ten feet into the office of a private business or government agency without seeing a network computer, which is on a server, which, in turn, is being backed up on tape (or some other media) on a daily, weekly or monthly basis. What alternative is there? Quill pens?

Furthermore, making the producing party pay for all costs of restoration as a cost of its "choice" to use computers creates a disincentive for the requesting party to demand anything less than all of the tapes. American lawyers engaged in discovery have never been accused of asking for too little. To the

---

1. "If evidence material to an issue in this case was peculiarly within the power of one party to produce and was not produced by that party and its absence has not been sufficiently accounted for or explained, then you may, if you deem it appropriate, infer that the evidence would have been unfavorable to the party which failed to produce it." Instruction 2.41, *Criminal Jury In-*structions for the District of Columbia (4th ed.1993).

2. The handful of cases are summarized in Note, *Allocating Discovery Costs in the Computer Age: Deciding Who Should Bear the Costs of Discovery of Electronically Stored Data*, 57 Wash. L.Rev. 257 (2000).

contrary, like the Rolling Stones, they hope that if they ask for what they want, they will get what they need. They hardly need any more encouragement to demand as much as they can from their opponent.

The converse solution is to make the party seeking the restoration of the backup tapes pay for them, so that the requesting party literally gets what it pays for. Those who favor a "market" economic approach to the law would argue that charging the requesting party would guarantee that the requesting party would only demand what it needs. Under that rationale, shifting the cost of production solves the problem. Note, *Electronic Media Discovery: The Economic Benefit of Pay–Per–View*, 21 Cardozo L.Rev. 1379 (2000).

But, there are two problems with that analysis. First, a strict cost-based approach ignores the fact that a government agency is not a profit-producing entity and it cannot be said that paying costs in this case would yield the same "profit" that other foregone economic activity would yield. Additionally, the government, which has no fewer rights than anyone else, has to insist that its employees do the restoration lest confidential information be seen by someone not employed by the government who has no right to see it. The reality, therefore, is that a government employee will be diverted from his ordinary duties to search backup tapes. When employees are thus diverted from their ordinary duties, the function of the agency suffers to the detriment of the taxpayers. Moreover, if government agencies are consistently required to pay for the restoration of backup tapes, they may be sorely tempted not to have such systems. There lies disaster; one shudders to think what would happen if the computer system at the Social Security Administration crashed and there was no backup system. While the notion that government agencies and businesses will not have backup systems if they are forced to restore them whenever they are sued may seem fanciful, courts should not lead them into temptation.

Second, if it is reasonably certain that the backup tapes contain information that is relevant to a claim or defense, shifting all costs to the requesting party means that the requesting party will have to pay for the agency to search the backup tapes even though the requesting party would not have to pay for such a search of a "paper" depository.

A fairer approach borrows, by analogy, from the economic principle of "marginal utility." The more likely it is that the backup tape contains information that is relevant to a claim or defense, the fairer it is that the government agency search at its own expense. The less likely it is, the more unjust it would be to make the agency search at its own expense. The difference is "at the margin."

Finally, economic considerations have to be pertinent if the court is to remain faithful to its responsibility to prevent "undue burden or expense". Fed.R.Civ.P. 26(c). If the likelihood of finding something was the only criterion, there is a risk that someone will have to spend hundreds of thousands of dollars to produce a single e-mail. That is an awfully expensive needle to justify searching a haystack. It must be recalled that ordering the producing party to restore backup tapes upon a showing of likelihood that they will contain relevant information in every case gives the plaintiff a gigantic club with which to beat his opponent into settlement. No corporate president in her right mind would fail to settle a lawsuit for $100,000 if the restoration of backup tapes would cost $300,000. While that scenario might warm the cockles of certain lawyers' hearts, no one would accuse it of being just.

Given the complicated questions presented, the clash of policies and the lack of precedential guidance, I have decided to take small steps and perform, as it were, a test run. Accordingly, I will order DOJ to perform a backup restoration of the e-mails attributable to Diegelman's computer during the period of July 1, 1998 to July 1, 1999. I have chosen this period because a letter from plaintiff's counsel to DOJ, complaining of retaliation and threatening to file an administrative claim, is dated July 2, 1998, and it seems to me a convenient and rational starting point to search for evidence of retaliation. I have chosen e-mail because of its universal use and because I am hoping that the resto-

ration will yield both the e-mails Diegelman sent and those he received.

The DOJ will have to carefully document the time and money spent in doing the search. It will then have to search in the restored e-mails for any document responsive to any of plaintiff's requests for production of documents. Upon the completion of this search, the DOJ will then file a comprehensive, sworn certification of the time and money spent and the results of the search. Once it does, I will permit the parties an opportunity to argue why the results and the expense do or do not justify any further search.