**Steven McPEEK, Plaintiff,**

v.

**John D. ASHCROFT, et al., Defendants.**

**Civ.A. No. 00–201(RCL/JMF).**

United States District Court,
District of Columbia.

Jan. 9, 2003.

**34**

Debra Susan Katz, Ari Micha Wilkenfeld, Lisa Jean Banks, Bernabei & Katz, Washington, DC, for plaintiff.

Allison C. Giles, Carlotta P. Wells, U.S. Department of Justice, Washington, DC, for defendants.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

In my initial opinion,[1] I permitted the search of certain backup tapes to ascertain whether that search would justify any additional searches. The search having been done, the parties could not disagree more completely as to what the search revealed. According to plaintiff, it produced useful, relevant information that justifies a second search of backup tapes for certain periods. He provides an affidavit from a forensic, computer technician who insists that a second search will not be that difficult or expensive given what the first search accomplished. Defendant disagrees and insists that the first search only produced documents that are cumulative of what plaintiff already has and that a second search would be expensive and time consuming and, therefore, completely unjustified.

A more significant consideration that has arisen is that the defendant has now ascertained that only certain backup tapes are available. Thus, the question presented has narrowed substantially to whether a search of the available backup tapes is appropriate. As my initial opinion indicates, whether a search of the backup tapes is appropriate involves an assessment of the likelihood that they will contain data (word processing documents and e-mails) that will produce information that is relevant to the lawsuit. Relevance is, in turn, a function of the relationship of the data to the two central accusations of this lawsuit: (1) that in the period from October 1994 to July 1998 the defendant retaliated against the plaintiff for plaintiff's complaints of sexual harassment against the former director of the Bureau of Prisons, Michael Quinlan ("Quinlan") and (2) that, after July 2, 1998, when plaintiff's counsel wrote a letter formally complaining about this retaliation, the defendant engaged in additional retaliatory activity that continued at least through January 12, 2002, when plaintiff's counsel informed the defendant of his intention to file this lawsuit.[2]

Since the lawsuit claims retaliation, "relevant data" would have to mean data making it more likely than not that the true motive for the acts about which plaintiff complains was retaliatory. That data could only take only two forms.

The first would be data indicating explicit retaliation, *i.e.,* specific references in the data to plaintiff's complaints about Quinlan.

The second would reveal the justification provided for the actions claimed by plaintiff to be retaliatory. Plaintiff would then have the right to establish that the justifications upon which the defendant relies are false, invoking the principle, familiar to Title VII jurisprudence, that the jury's disbelief of a witness's testimony permits it to draw the inference that the witness's motivation to lie is to disguise that the real reason for his actions were discriminatory or retaliatory. *Waterhouse v. Williams,* 298 F.3d 989, 992 (D.C.Cir.2002)

The next phase of the analysis would be to assess the likelihood that such information exists within the period of time for which

---

1. *McPeek v. Ashcroft,* 202 F.R.D. 31 (D.D.C. 2001).

2. Plaintiff filed this lawsuit on February 3, 2000. He filed his *Amended Complaint* on April 28, 2000.

backup tapes are available. The frustration of electronic discovery as it relates to backup tapes is that backup tapes collect information indiscriminately, regardless of topic. One, therefore, cannot reasonably predict that information is likely to be on a particular tape. This is unlike the more traditional type of discovery in which one can predict that certain information would be in a particular folder because the folders in a particular file drawer are arranged alphabetically by subject matter or by author. In this case, there is the additional frustration that the tapes that do exist do not exist for clearly defined chronological periods but instead exist for certain days without any rhyme or reason for their continued existence.

Given the truly random nature of the collection of data on backup tapes, only two approaches suggest themselves. The one plaintiff suggests would be to search all the tapes insofar as they exists for the periods of time that plaintiff seeks. But, that expansion could only be justified by the possibility that there may exist data on the backup tapes that is relevant as I have defined that word, *i.e.,* because it contains explicit references to (1) the complaints plaintiff made about Quinlan, (2) the letters his counsel wrote on July 2, 1998, or (3) his counsel's expression of an intent to file suit in a letter dated January 12, 2000, or (4) because it bears on the justification for the actions plaintiff complains were retaliatory. There is a theoretical possibility that such data exists on backup tapes but I have previously rejected the notion that the mere possibility that data exists justifies forcing the government to search backup tapes irrespective of the cost. *McPeek,* 202 F.R.D. at 33. Rather, the less likely it is that the backup tapes contain relevant data, the more unjust it would be to force the government to search the tapes.

The likelihood of finding relevant data has to be a function of the application of the common sense principle that people generate data referring to an event, whether e-mail or word processing documents, contemporaneous with that event, using the word "contemporaneous" as a rough guide. Conversely, it is unlikely that people, working in an office, generate data about an event that is not contemporaneous unless they have been charged with the responsibility to investigate that event or to create some form of history about it.

I will, therefore, use these principles to analyze the appropriateness of requiring additional searches of the available backup tapes.

■ *Robert Diegelman.* There are seven backup tapes available for Diegelman: January 5, 1998, January 7, 1998, January 8, 1998, January 12, 1998, April 4, 1998, April 7, 1998 and May 6, 1998. *Second Declaration of Scott D. Martin,* ¶ 3(a), *Exhibit C to Defendant's Response to Plaintiff's Memorandum Regarding Additional Computer Discovery* (hereafter "Martin"). Plaintiff made his complaint about Quinlan on June 5, 1992, and began his new job, reporting directly to Diegelman, in September, 1994. *Amended Complaint,* ¶¶ 20, 24. Thus, as to what I have described as "explicit retaliation", one would have to believe that Diegelman was still making references to the complaint that plaintiff had made about Quinlan six years earlier. I find the likelihood of this occurring to be so small that it cannot justify any additional search for "explicit retaliation" in the available backup tapes.

As to data bearing on events claimed to be retaliatory, the only event anywhere close in time to the dates of the available backup tapes is May 19, 1998, the date when plaintiff asked Diegelman to formally request that his position be upgraded. *Amended Complaint* ¶ 36. Plaintiff claims that Diegelman rejected the request because plaintiff's position was temporary and a promotion could not be justified for a position that did not have the support of the Department of Justice. Diegelman is also said to have falsely claimed that he was not the appropriate decision maker for the promotion plaintiff sought. *Id.*

It is unlikely, to the point of being inconceivable, that Diegelman generated data on his computer bearing on the truthfulness or legitimacy of his rejection of plaintiff's request months or even weeks before plaintiff even made the request. I, therefore, cannot see any legitimate basis on this record for

any additional search of the available backup tapes.

*Janis Sposato.* There are eight tapes available for Sposato: June 11, 1998, March 1, 1999, April 30, 1999, June 30, 1999, July 30, 1999, August 27, 1999, November 11, 1999 and January 31, 2000. Martin, ¶ 3(d). Plaintiff seeks a search of backup tapes for Sposato's computer for the periods May 1, 1998, to August 1, 1998, and February 1, 1999 to February 1, 2000. *Memorandum Regarding Additional Computer Discovery Pursuant to Court's Direction of October 2, 2001* (hereafter "Memo."), at 6.

There are no indications in the *Amended Complaint,* nor does plaintiff otherwise claim, that Sposato ever made explicit references to plaintiff's complaints against Quinlan and it is again highly unlikely that Sposato made such explicit references eight years after plaintiff complained about Quinlan and four years after plaintiff left the Bureau of Prisons.

Unfortunately, there are no explicit references to Sposato's activities in this case in the *Amended Complaint.* In seeking a search of additional backup tapes, and writing before the defendant indicated what backup tapes were in fact available, plaintiff spoke of Sposato's activities in the periods plaintiff identified. As to the first period, from April 1 to August 1, 1998, Sposato is said to have been "one of the main officials considering McPeek's claim of retaliation, which was filed during this period." Memo at 6. Plaintiff also says that, during this period, Sposato "denied a request to institutionalize JPR and to create a GS–15 supervisory position for JPR, and by implication, for Mr. McPeek." *Id.* at 6–7.

■ But, plaintiff's counsel's letter to the Department of Justice, complaining of retaliation, is dated July 2, 1998, and it is impossible that there would be data, suggesting an intent to retaliate for making that complaint, on the only available backup tape for 1998, June 11, 1998, that can only contain data created *before* the complaint was made. I, therefore, will not order the search of the 1998 tape.

Plaintiff claims that during the other period of time for which he seeks the search of the backup tape, from February, 1999, to February, 2000, "Sposato ratified the denial of Mr. McPeek's classification appeal and the disbanding of JPR, both of which constitute central claims of retaliation." Memo. at 7. But, we know from the *Amended Complaint* that Diegelman did not deny plaintiff's request for reclassification of his job until June 11, 1999. *Amended Complaint,* ¶ 67. Therefore, Sposato could not have ratified that denial before it occurred and I will not order a search of the backup tapes for March 1, 1999, and April 30, 1999.

As to the disbanding of the office known as "JPR" (Justice Performance Review), the *Amended Complaint* indicates that on January 13, 2000, the day after plaintiff's counsel informed Department of Justice officials that he intended to file suit, Diegelman removed plaintiff's responsibilities as Deputy Director of JPR and transferred "the functions to Assistant Directors in MPS (*i.e.,* Management and Planning Staff of the Justice Management Division)." *Amended Complaint* ¶ 76. Then, on January 24, 2000, Diegelman is said to have "changed the name for DOJ reinvention activities from JPR to Justice Partnership for Innovation." *Id.* ¶ 79.

Since this "dismantling" did not occur until January, 2000, it is once again impossible for there to be evidence of Sposato's ratification of it in the backup tapes for June 11, 1998, March 1, 1999, April 30, 1999, June 30, 1999, July 30, 1999, August 27, 1999, or November 11, 1999. The backup tape for January 31, 2000, postdates the alleged dismantling of JPR and is close enough in time to warrant a search of it with the understanding that the defendant need only search it for references to plaintiff's intention to file suit or to any aspect of Diegelman's activities in reference to JPR in the month of January, 2000.

*Brenda Hurst.* There may well be a transcription or typographical error in Martin's Declaration. As to all other persons for whom the Department of Justice has backup tapes he indicates that the tape exists for a specific date. As to Hurst, he says:

> We have three JCON2 tapes available for the time periods relating to Brenda Hurst:

November 1998, February, 1999, and December 30, 1999.

Martin, ¶ 3(b).

Thus, the words "November" and "February" are not followed by specific dates and this may incorrectly indicate that backup tapes for the entire month are available. Resolving whether one month of backup tapes should be searched presents an entirely different issue from whether backup tapes for two days should be searched. I want to make sure that I am deciding the issue actually presented. To that end, I will require the defendant to submit a supplemental declaration from Martin in which he either corrects his present declaration to specify the dates in November, 1998, and February, 1999, for which backup tapes for Hurst's computer exists or states that backup tapes for the entire months exist. Plaintiff will then be permitted to establish why there should be an additional search of whatever backup tapes do exist using the principles of relevancy I have articulated in this Memorandum Opinion by establishing that it is more likely than not that these tapes contain specific references to plaintiff's complaints about Quinlan or reveal the justification for actions claimed by plaintiff to be retaliatory.

*David Orr.* Backup tapes from Orr's computer exist for only one day, December 30, 1999. But, plaintiff says that, "Orr, an MPS Assistant Director, was installed by Mr. Diegelman as Mr. McPeek's 'supervisor' after he disbanded JPR and removed Mr. McPeek's remaining supervisory responsibilities." Memo. at 8. While there is a possibility that Orr and Diegelman discussed this transition, as plaintiff insists (*id.*), that possibility hardly makes its likely that data created by plaintiff's successor on a single day, two weeks before Diegelman's removal of McPeek's responsibilities, will produce relevant evidence as I have defined that term.

### CONCLUSION

With the exception of searching the Sposato backup tape for January 30, 2000, I will not order any additional searches of the available backup tapes for Diegelman, Sposato, or Orr.

As to Hurst, the defendant will have to file a supplemental declaration by Martin within 10 days of this Memorandum Opinion. Plaintiff will then have 14 days to show why whatever backup tapes are available for Hurst should be searched using the principles I have articulated in this *Memorandum.*