**MEDTRONIC SOFAMOR DANEK, INC.,**
Plaintiff/Counterclaim Defendant,

v.

Gary Karlin MICHELSON, M.D. and Karlin Technology, Inc., Defendants/Counterclaimants,

and

Gary K. Michelson, M.D., Third Party Plaintiff,

v.

Sofamor Danek Holdings, Inc., Third Party Defendant.

No. 01–2373–MLV.

United States District Court,
W.D. Tennessee,
Western Division.

May 13, 2003.

Leo Maurice Bearman, Jr., Bradley E. Trammell, Baker Donelson Bearman & Caldwell, Memphis, TN, Jack Q. Lever, Melvin White, Michael D. Switzer, William Hagedorn, Ronald J. Pabis, Raphael V. Lupo, Mary C. Chapin, McDermott Will & Emery, Washington, DC, for plaintiff/counter-defendants/third-party defendant/counter-claimant.

Jay S. Bowen, Taylor Cates, Bowen Riley Warnock & Jacobson, Nashville, TN, Stanley M. Gibson, Dan P. Sedor, Marc Marmaro, Joan M. Steinmann, Jeffer Mangels Butler & Marmaro LLP, Walker A. Matthews, Robert G. Krupka, Boaz M. Brickman, Patricia Cirucci, Marc H. Cohen, Lindsay E. Dinn, J. Drew Diamond, Kirkland & Ellis, Los Angeles, CA, for defendants/counter-claimants/third-party plaintiffs/counter-defendant.

Diane Vescovo, U.S. District Court, Office of the Clerk, John I. Houseal, Jr., Glankler Brown, PLLC, Marc Louis Schatten, Glankler Brown, Memphis, TN, for miscellaneous.

Alan Balaran, Law Office of Alan Balaran, Washington, DC, for special master.

ORDER GRANTING IN PART AND DE-
NYING IN PART DEFENDANT MI-
CHELSON'S MOTION TO COMPEL
ELECTRONIC MAIL MESSAGES
AND DATA AND REQUEST FOR AP-
POINTMENT OF SPECIAL MASTER

VESCOVO, United States Magistrate
Judge.

Before the court is the January 31, 2003 motion of defendant Gary K. Michelson to compel the plaintiff, Medtronic Sofamor Danek, Inc., to produce approximately 996 network backup tapes, containing, among other things, electronic mail, plus an estimated 300 gigabytes of other electronic data that is not in a backed-up format, all of which contains items potentially responsive to discovery requests propounded by Michelson. Medtronic timely responded claiming that the discovery requests are unduly burdensome because extracting the data from backup tapes and reviewing it for relevance and privilege will be astronomically costly. Michelson counters that Medtronic, as the producing party, should bear the cost of disclosure and requests that the court appoint a special master to help the parties establish a discovery protocol. The motion was referred to the United States Magistrate Judge on February 5, 2003, for a determination. For the reasons that follow, this court grants in part and denies in part Michelson's motion.

## ANALYSIS

This case involves trade secrets, patents and trade information in the field of spinal fusion medical technology.[1] The instant dispute arises over Medtronic's obligation to produce electronic data. The parties have not been able to agree on a protocol for production, on the scope of production, or, most importantly, on who should bear the cost of production.

Producing electronic data requires, at minimum, several steps: (1) designing and applying a search program to identify potentially relevant electronic files; (2) reviewing the resulting files for relevance; (3) reviewing the resulting files for privilege; (4) deciding whether the files should be produced in electronic or printed form, and (5) actual production. If, however, the information is contained on backup tapes, a preliminary step must be performed. All data on each backup tape must be restored from the backup tape format to a format that a standard computer can read. In the case of a large volume of data on multiple tapes like this case presents, the restored files from each tape must be compared to the restored files from every other tape and duplicate files eliminated. The restored files that are not duplicates must be converted to a common format so that a search program may seek information within them. The de-duplication and conversion are required so that large volumes of data in different formats may be searched in a reasonable time.

### A. Scope of Production and Relevancy

Information is discoverable if "relevant to the claim or defense of any party" or if it "appears reasonably calculated to lead to the discovery of admissible evidence." FED. R.CIV.P. 26(b)(1). See also Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); Lewis v. ACB Bus. Services, Inc., 135 F.3d 389, 402 (6th Cir.1998). Nevertheless, discovery does have "ultimate and necessary boundaries," Oppenheimer Fund, 437 U.S. at 351, 98 S.Ct. 2380 (quoting Hickman v. Taylor, 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). "[I]t is well established that the scope of discovery is within the sound discretion of the trial court." Coleman v. American Red Cross, 23 F.3d 1091, 1096 (6th Cir.1994) (quoting United States v. Guy, 978 F.2d 934, 938 (6th Cir.1992)). The court need not compel discovery if it determines that the request is "unreasonably cumulative ... [or] obtainable from some other source that is more convenient, less burdensome, or less expensive ...

---

1. The factual and procedural background of this lawsuit has been well-documented in previous discovery orders. See, e.g., Medtronic Sofamor Danek, Inc. v. Michelson, No. 01–CV–2373–GV (W.D.Tenn. Jan. 30, 2002) (order on cross-motions for protective order and on motions to compel); Medtronic v. Michelson (July 18, 2002) (order on defendants' motion to compel and sanctions); Medtronic v. Michelson (Aug. 6, 2002) (order on defendants' motion to approve Bruce Ross under the protective order).

[or] the party seeking discovery has had ample opportunity by discovery in the action to obtain the information ... [or] the burden or expense of the proposed discovery outweighs its likely benefit." FED.R.CIV.P. 26(b)(2)(i)-(iii). Electronic information, if relevant, generally is discoverable under these same guidelines. FED.R.CIV.P. 34, 1970 Adv. Comm. Note; *Anti–Monopoly, Inc. v. Hasbro, Inc.*, Civil Case No. 94 CIV. 2120, 1995 WL 649934, *1–2 (S.D.N.Y. Nov. 3, 1995); *Daewoo Electronics Co. v. United States*, 650 F.Supp. 1003, 1006 (C.I.T.1986).

In this case, the parties do not seriously dispute the relevance of the electronic data at issue. Hard-copy printouts of representative e-mails, provided under seal by Michelson, indicate that the backup tapes may contain discoverable material, although neither party can estimate how much. (*See* Confidential Decl. of Dan P. Sedor in Supp. of Def.'s Mot. to Comp. Prod. of Electronic Mail Messages and Data and Request for Appointment of Special Master [hereinafter Sedor Confidential Decl.] at Exs. A, B.) Medtronic also admits that the backup tapes probably contain discoverable information. (Opp'n to Dr. Michelson's Mot. to Comp. Electronic Mail Messages and Data and Request for App't of Special Master [hereinafter Pl.'s Opp'n to Def.'s Mot.] at 15).

Michelson asserts that information it seeks is contained in some 20,000 gigabytes ("gb")[2] of data stored on 515 of Medtronic's network backup tapes and in approximately 210gb of electronic files from various individuals at Medtronic. Medtronic disagrees, asserting that the backup tapes number 993 with a 61 terabyte[3] data volume, (Pl.'s Opp'n to Def.'s Mot. at 2, Ex. D), and that the electronic files from individuals total 300gb. (*Id.* at 6, Ex. E.) Medtronic should be in the better position to know the extent of its electronic data holdings, and the court will therefore use Medtronic's estimates for its analysis.

Given the volume of data at issue, the court agrees that this process, as a whole, will be burdensome. The court must therefore determine whether the burden on Med-

tronic, the producing party, is undue, and, if so, whether it should be shifted in whole or in part to Michelson, the requesting party.

### B.   *Undue Burden and Cost–Shifting*

■   Generally the party responding to a discovery request bears the cost of compliance. *Rowe Entertainment, Inc. v. The William Morris Agency, Inc.*, 205 F.R.D. 421, 428–29 (S.D.N.Y.2002)(citing *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 358, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978)). "Nevertheless, a court may protect the responding party from 'undue burden or expense' by shifting some or all of the costs of production to the requesting party." *Id.;* FED.R.CIV.P. 26(b)(2), (c). The inquiry in a cost-shifting analysis is not necessarily whether the cost is substantial but whether it is "undue." *Oppenheimer Fund*, 437 U.S. at 358, 98 S.Ct. 2380; *Rowe Entertainment*, 205 F.R.D. at 428–29.

■   Undue burden is decided on a case-by-case basis. *Bills v. Kennecott Corp.*, 108 F.R.D. 459, 463 (D.Utah 1985). To help determine whether an expense is "undue," courts have adopted a balancing test that considers the following factors:

> (1) the specificity of the discovery requests; (2) the likelihood of discovering critical information; (3) the availability of such information from other sources; (4) the purposes for which the responding party maintains the requested data; (5) the relative benefit to the parties of obtaining the information; (6) the total cost associated with the production; (7) the relative ability of each party to control costs and its incentive to do so; and (8) the resources available to each party.

*Rowe Entertainment*, 205 F.R.D. at 428–29; *Murphy Oil USA, Inc. v. Fluor Daniel, Inc.*, Civil Case No. Civ.A. 99–3564, 2002 WL 246439 (E.D.La.2002)(quoting *Rowe Entertainment*). *See also Bills*, 108 F.R.D. at 464 (setting forth a four-factor test).

---

**2.**  It would take approximately 711 standard 3.5″ diskettes to store one gigabyte of data.

**3.**  A terabyte is 1024 gigabytes. It would take approximately 728,178 standard 3.5″ diskettes to store one terabyte of data.

### 1. *Specificity of the Discovery Requests*

Michelson has served at least eight separate sets of document requests in the course of this litigation and indicates that the instant motion addresses the following from his first request for production of documents:

Request No. 8: All documents on any type of electronic, magnetic or optical storage media that contain Dr. Michelson's or Karlin Technology's name or any variation thereof.

Request No. 42: All documents evidencing, reflecting, or relating to any estimate, calculation, analysis or evaluation of the value of any Interbody Technology.

Request No. 108: All documents evidencing, reflecting, or relating to Medtronic's efforts to obtain regulatory approval for any Threaded Spinal Implants, Instruments and Methods or Non–Threaded Spinal Implants, Instruments and Methods.

Request No. 109: All documents evidencing, reflecting, or relating to Medtronic's efforts to obtain regulatory approval for any Interbody Technology that competes or has competed with any Threaded Spinal Implants, Instruments and Methods or Non–Threaded Spinal Implants, Instruments and Methods.

Request No. 112: All documents evidencing, reflecting, or relating to Medtronic's efforts to "actively promote" the sale of any Threaded Spinal Implants, Instruments and Methods or Non–Threaded Spinal Implants, Instruments and Methods.

Request No. 116: All documents evidencing, reflecting, or relating to Medtronic's efforts to commercialize any Interbody Technology that competes or has competed with any Threaded Spinal Implants, Instruments and Methods or Non–Threaded Spinal Implants, Instruments and Methods.

Request No. 116: All documents evidencing, reflecting, or relating to your notes, memoranda and correspondence prepared by any of your current or former employees, officers, and directors, including Lawrence Boyd, Brad Estes, Brad Coates, John Pafford, Ronald Pickard, Robert Rodrick, Rick Duerr and David Ahlersmeyer, relating to any medical device, technology, implant, instrument, method, know-how, trade secret, confidential information, proprietary right, process, and all engineering, design, and technical information and data based on or incorporating in whole or in part any Dr. Michelson invention, conception, development, acquisition or possession.

(Mem. of Points and Authorities in Supp. of Defs.' Mot. to Comp. Discovery of Electronic Mail Messages and Data and Request for Appointment of Special Master [hereinafter Def.'s Mem. in Support of Mot.] at 3–5.)

██ Michelson's requests are very broad, and he has done little to limit the scope of the requests. Michelson has offered Boolean search terms that he believes will reveal relevant electronic files and has identified about 40 employees in whose files he has a particular interest. (*See* Decl. of Dan P. Sedor in Supp. of Def.'s Mot. to Comp. Prod. of Electronic Mail Messages and Data and Request for Appointment of Special Master [hereinafter Sedor Decl.] at Exs. D, F; Pl.'s Opp'n to Def.'s Mot. at 15, Ex. C.) He also, in the instant motions, limits his request to the electronic data for Sofamor Danek alone and advances his understanding that Sofamor Danek "did not rely heavily on e-mail until 1997." (Defs.' and Counterclaimants' Mot. and Supp. Mem. for Leave to File Reply to Medtronic's Opp. to Mot. to Comp. Prod. of Electronic Mail Messages and Data and Request for Appointment of Special Master [hereinafter Defs.' Reply Mot.] at 7. *See also* Pl.'s Opp'n to Def.'s Mot. at 4 (characterizing the lawsuit as involving only the Interbody and Cervical divisions of Danek).) Nonetheless, Medtronic objects that, even with the limitations Michelson proposes, Medtronic still must restore all its backup tapes to conduct any search and accordingly that the request is too broad. (Pl.'s Opp'n to Def.'s Motion at 15.)

It appears to the court and the court so finds that Michelson has not specifically limited his requests by date, despite his apparent understanding that tapes from 1997 to 2000 are those most likely to reveal the electronic mail he seeks and that data from 2000 to present might be available without

any resort to backup tapes. Accordingly, the court finds that this factor weighs in favor of Michelson bearing part of the production cost.

### 2. *Likelihood of Discovering Critical Information*

The parties agree that the electronic mail files stored on backup tapes may contain some relevant information, although neither knows how much. (*See* Sedor Decl. at 15; Pl.'s Opp'n to Def.'s Mot. at 15.)[4] Michelson has produced seven pages of e-mail printouts in support of his claim that Medtronic's e-mail archives hold relevant—indeed, critical—information. (Sedor Confidential Decl. at Exs. A, B.) These apparently were selected from an estimated one million pages of hard copy that Medtronic already has produced. (Pl.'s Opp'n to Def.'s Mot. at Ex. A.) Even if the court accepts Michelson's assertion that "nearly one-third of electronically stored data is never printed out," (Def.'s Mem. in Support of Mot. at 6, n. 3 (citing *Rowe Entertainment*)), Michelson offers little evidentiary support for his implication that Medtronic's e-mail archives are replete with relevant communications. Further, Michelson has not offered to restrict the scope of his discovery to e-mail alone, nor has he accepted Medtronic's proffered protocol that allows Michelson to assess the relevance of backup tapes by restoring sample tapes. Accordingly, the court finds that this factor weighs in favor of shifting part of the production cost to Michelson.

### 3. *Availability from Other Sources*

The parties agree that the electronic mail stored on backup tapes probably is not available from other sources. Taken alone, this factor weighs in favor Medtronic bearing the cost of production because Michelson has no alternative for obtaining Medtronic's archived e-mail. Medtronic, however, objects

that the extent to which any data file duplicates a previously disclosed document cannot be known until after document review.

Authority is split over whether a party automatically is entitled to both hard copy and electronic versions of computer files.[5] Electronic records may, however, contain data that the hard copy does not. "[I]important information present in the e-mail system, such as who sent a document, who received it, and when that person received it, will not always appear on the computer screen and so will not be preserved on the paper print-out." *Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1284 (D.C.Cir.1993).

Because the electronic data files reasonably could lead to the discovery of admissible evidence that is not available from hard copy, *see* FED.R.CIV.P. 26(b)(1), this factor weighs in favor of Medtronic bearing the cost of production.

### 4. *Purpose for Maintaining the Data*

Medtronic claims backup tape restoration is unwarranted because its backup tapes are not used in daily business, are not intended to be used in daily business, are intended only for emergency disaster recovery, and the majority of them would not exist at all but for Medtronic's obligation to retain the data in association with unrelated litigation.

Michelson counterargues that the backup tapes are related to Medtronic's current business activities. Michelson points to Medtronic's contractual obligations in the instant suit compelling Medtronic to retain certain records. Because Medtronic is obligated to keep those data, Michelson argues, the backup tapes represent a current business activity. In his supplemental memorandum, Michelson argues that the recent deposition testimony of three former key executives of

---

4. Michelson's motion does not address the likelihood of discovering relevant data in the other 300gb of files that are not stored on backup tapes.

5. The split is discussed in *McNally Tunneling Corp. v. City of Evanston*, 2001 WL 1568879, *4 (N.D.Ill.2001), which compares *Williams v. Owens–Illinois, Inc.*, 665 F.2d 918, 932–33 (9th Cir.

1982) (finding the district court did not abuse its discretion in denying request for computer tapes where party already had all information from tapes on wage cards) with *Anti–Monopoly*, 1995 WL 649934 at *2 ("[P]roduction of information in 'hard copy' documentary form does not preclude a party from receiving that same information in computerized/electronic form.")

Medtronic establishes that Medtronic used e-mail a "tremendous amount" in the 1990's, thus Medtronic had a business purpose for retention of e-mail.

In *Rowe Entertainment*, the court found backup tapes retained for disaster recovery do not constitute current business activity. There, the court found no evidence that the producing parties ever used their own backup tapes for information or even had the programs necessary to restore backup data. "Cost-shifting [was] therefore warranted with respect to the backup tapes." *Rowe Entertainment*, 205 F.R.D. at 431.

The question of whether backup tapes retained for disaster recovery alone constitute current business activity has been explored in several other cases, in addition to *Rowe Entertainment*. In *Murphy Oil*, the court reached the same conclusion as *Rowe Entertainment*. The requesting party in *Murphy Oil* sought 93 e-mail backup tapes. The responding party had no means of retrieving data from those tapes. Following *Rowe Entertainment*, the court determined that the tapes were being maintained solely for emergency data recovery and not for current business activities. The court accordingly shifted to the requesting party the burden of restoring the backup tapes. *Murphy Oil*, 2002 WL 246439 at *7–9.

In *In re Brand Name Prescription Drugs Antitrust Litigation*, 1995 WL 360526, at *2, 1995 U.S. Dist. LEXIS 8281, *5 (N.D. Ill. June 15, 1995), however, the court held that the producing party must bear the cost of restoring backup tapes, noting that the producing party "essentially admit[ted] that a part of the burden attendant to searching its storage files result[ed] from the limitations" of its own software. *Brand Name Prescription Drugs*, 1995 WL 360526 at *2, 1995 U.S. Dist. LEXIS 8281 at *6. Similarly, the court in *Delozier v. First Nat'l Bank of Gatlinburg*, 109 F.R.D. 161 (E.D.Tenn.1986) held that, with respect to microfilm storage, cost-shifting was unjustified when the expense of production arose solely from the producing party's maintenance of a data storage system over which the requesting party had no control. *Delozier*, 109 F.R.D. at 164.

As succinctly discussed in *McPeek v. Ashcroft*, 202 F.R.D. 31 (D.D.C.2001), both lines of reasoning have their flaws. In *McPeek*, the plaintiff and requesting party was a former Bureau of Prisons employee. He sought to force the defendant, the United States Department of Justice, to search its data backup systems for evidence related to his discrimination claim. As in the instant case, the defendant did not know what the backup tapes might contain; the defendant had not searched the tapes on its own behalf in the litigation; the defendant maintained the tapes primarily for disaster recovery; and the requesting plaintiff specifically was interested in the defendant's archived e-mail. The court conducted a review of relevant case law and summarized the problem thus:

> The one judicial rationale that has emerged [from case law] is that producing backup tapes is a cost of doing business in the computer age. But, that assumes an alternative ... What alternative is there? Quill pens?
>
> ... [M]aking the producing party pay for all the costs of restoration as a cost of its "choice" to use computers creates a disincentive for the requesting party to demand less than all of the tapes ... The converse solution is to make the party seeking the restoration of the backup tapes pay for them, so that the requesting party literally gets what it pays for. But ... if it is reasonably certain that the backup tapes contain [relevant] information, shifting all costs to the requesting party means that the requesting party will have to pay ... even though the requesting party would not have to pay for such a search of a "paper" depository.
>
> A fairer approach borrows ... from the economic principle of "marginal utility." The more likely it is that the backup tape contains information that is relevant to a claim or defense, the fairer it is that the [responding party] search at its own expense.

*McPeek*, 202 F.R.D. at 33–34 (internal citations omitted).

In this case, Medtronic conducted a regular backup procedure for data restoration in the case of disaster and it chose not to

overwrite its regular backup tapes in recognition of its obligation to preserve evidence in unrelated litigation. There is no showing that Medtronic ever retrieved data from the backup tapes or even had the means to do so. Thus, the court finds that the backup tapes were not maintained for business purposes. The recent deposition testimony of the three former key executives who admitted to using e-mail frequently does not alter the court's conclusion that the back-up tapes do not constitute current business activity. Those depositions merely suggest to the court that Medtronic should also search the hard drives of the computers of key executives.

Under these circumstances, *McPeek's* "marginal utility" analysis is appropriate. The critical inquiry is whether the reason for maintaining the backup tapes indicates that the tapes are so likely to contain relevant information that the producing party should bear the cost of their production. *See McPeek*, 202 F.R.D. at 34; *Byers v. Illinois State Police*, No. 99–C–8105, 2002 WL 1264004, *11, 2002 U.S. Dist. LEXIS 9861, *35 (June 3, 2002)(holding that "[w]hen faced with a request that would impose a significant cost on the responding party, a court should focus on the marginal utility of the proposed search").

The parties stipulate that some of the backup tape data, particularly archived e-mails, probably are relevant. Michelson, however, has not made any showing that such data would be found on each and every backup tape. The electronic mail printouts Michelson provided in support of his motion are dated between March 1998 and February 2001. Michelson himself notes a reduced likelihood of finding relevant information on backup tapes created prior to 1997. Because Michelson has made no showing that the entire spectrum of backup tapes will contain information relevant the cause's claims or defenses, this factor weighs in favor of shifting production costs to Michelson, the requesting party.

### 5. *Relative Benefits to Each Party*

Michelson argues that Medtronic likely will use the electronic data in the instant litigation. Medtronic asserts, however, that it has not yet searched the backup tapes for litigation-related data and, because of the expense involved, would be unlikely to do so unless compelled by court order. The court finds, therefore, that the parties will equally benefit from the electronic discovery, and this factor does not sway the cost-shifting analysis in favor of either party.

### 6. *Total Cost of Production*

The physical production of the backup tapes is not really at issue. The production of their archived data in a format Michelson can use, and in a way that accommodates Medtronic's privilege concerns, is another matter entirely. *See Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1171 (7th Cir.1998) (approving lower court's decision requiring the producing party to give the requesting party a means to read its backup tapes).

Four distinct areas of expense emerge from the parties' descriptions of the process: first, the cost of restoring backup tapes and converting the data on them to a common, i.e., searchable, format; second, the cost of designing and conducting searches to identify potentially responsive files; third, the cost of reviewing responsive files for privilege; and, fourth, the cost of actually producing the responsive non-privileged files.

As to the cost of restoring backup tapes, Medtronic indicates that its preferred vendor, Kroll Ontrack, will restore, search, and de-duplicate the data on 124 sample tapes for a flat fee of $605,300. (Pl.'s Opp'n to Def.'s Mot. at Ex. C, ¶¶ 9, 10, 14.) According to Medtronic, initial vendor bids on restoration alone ranged from $600 to $1,000 per backup tape. (*Id.* at Ex. A, ¶ 7.) Michelson does not provide any competing estimates but only asserts that, without performing a "pilot" restoration, no vendor accurately can estimate the cost of restoring backup tapes. (Def.'s Reply Mot. at Kuchta Decl. ¶ 5.) Neither party provides an itemized estimate for designing a search to identify potentially relevant documents, de-duplicating files, or conducting the search.

Medtronic's estimates of privilege review costs vacillate between $16.5 million, (Pl.'s Opp'n to Def.'s Mot. at Ex. G), and $70

million, (id. at Ex. A). The cost of the privilege review cannot be known until the volume of discoverable documents is known. Generally, privilege review expenses are borne by the responding party. See, e.g., Rowe Entertainment, 205 F.R.D. at 421. Medtronic does not dispute this and in fact offers to bear the cost of privilege review for disclosure provided under a reasonable discovery protocol. (Pl.'s Opp'n to Def.'s Mot. at 15.)

Both parties give per-page printing cost estimates for the volume of data they expect to produce. Again, these estimates widely vary, and the court does not have enough information to determine how much relevant data actually could be produced. Because all the disputed data is electronic, some or all of the data may be produced electronically. But, without an estimate of the actual data volume involved, the court cannot speculate on the cost of electronic storage media. Accordingly, the cost of physical production is not considered when totaling the cost of production.

Based on the foregoing, the court finds that the cost of restoring, de-duplicating, and designing and conducting a search of all 996 backup tapes reasonably could be in the range of several million. This, of course, does not include the costs of privilege review and actual production, which cannot be estimated yet. Although the cost could be less than 2% of the amount at issue in this suit, the cost is substantial. The court therefore finds it undue. Accordingly, the court finds that this factor weighs in favor of shifting some cost to the requesting party, Michelson.

### 7. Relative Ability to Control Costs

Michelson makes no argument concerning Medtronic's ability to control costs. Medtronic points out that Michelson has nearly unfettered ability to control costs by limiting the scope of his discovery requests. The court agrees and finds that this factor weighs in favor of Michelson bearing part of the production cost.

### 8. Resources Available to Parties

Neither party adduces persuasive evidence of inability to bear part of the discovery cost.

Michelson asserts that Medtronic is a large and profitable company but sets forth no comparative figures that indicate he is in a worse position to bear part of the cost. Based on the voluminous pleadings in the court file in this case, it is clear that both parties have expended, and continue to expend, significant sums for legal services. Accordingly, the court finds that both parties are equally able to bear part of the discovery costs and that this factor is neutral in the cost-shifting analysis.

In addition, the court finds that imposing the full cost of production on Medtronic is not warranted solely on the basis of Michelson's assertions that Medtronic has failed to cooperate in electronic data discovery. While it is true that Medtronic has been dilatory in producing electronic data, it is understandable that Medtronic would not begin production until the parties had agreed on a protocol for production, review, and payment of expenses. None of the exhibits reveals bad faith or obstruction by Medtronic. To the extent that Michelson seeks to impose the full cost of electronic discovery on Medtronic as a sanction for delaying production, the motion is denied.

In light of all the circumstances of this case, the court finds that cost-shifting is warranted. Michelson, the requesting party, shall therefore bear part of the production costs.

### C. Special Master

Michelson also asks the court to appoint a special master to oversee the electronic records production and to review the data files that are produced, and he has suggested several local attorneys to serve as a special master. Medtronic disagrees with Michelson's suggestion for an attorney to serve as a special master and insists instead that a neutral computer expert would be the better choice to oversee the discovery process. Medtronic also maintains that the special master should not be the one to review the data, as suggested by Michelson, because one person cannot possibly review all the data that will be disclosed.

Under Federal Rule of Civil Procedure 53(a), the appointment of a special master is the exception not the rule. In actions to be tried to a jury, a special master shall only be appointed when the issues are complicated. FED.R.CIV.P. 53(b), Adv. Comm. Notes, 1983 amend. Given the amount of electronic data at issue, the court finds that the appointment of a special master to oversee discovery is warranted and that the special master should be a technology or computer expert. The special master's duties will include making decisions with regard to search terms; overseeing the design of searches and the scheduling of searches and production; coordinating deliveries between the parties and their vendors; and advising both parties, at either's request, on cost estimates and technical issues. The special master shall be subject to all confidentiality requirements and protective orders set forth in this and in other orders in this cause. The special master may designate assistants with the parties' approval; if he or she does so, the same protective orders and confidentiality agreements shall apply to any assistants.

Within five (5) days from the date of this order, the parties shall agree upon a neutral computer expert to serve as a special master. If the parties cannot agree on an expert, each side shall submit to the court, within five (5) days from the date of this order, the names of two prospective experts along with a summary of the expert's qualifications, not to exceed one page, the expert's fee structure, and an itemized estimate for the expert's services, not to exceed one page. The court will select a special master from among the four names submitted. After the special master has been selected, all communications between either party and the special master shall be copied to the other party. The parties will equally bear the cost of the special master's services.

### D. Discovery Protocol

The deadline for completing discovery in this case is November 10, 2003. Each party has submitted a proposed discovery protocol. (See Def.'s Mem. in Supp. of Mot. at 20; Pl.'s Opp'n to Def.'s Mot. at Ex. C.) Each also has provided statements from technology professionals in support of their respective proposals. (See Pl.'s Opp'n to Def.'s Mot. at Exs. D, E; Def.'s Reply Mot. at Ex. A.) After careful review of the proposals and of discovery plans crafted by courts in like cases, the court adopts the following discovery plan. These deadlines may be modified only by signed agreement between the parties or by the special master, provided that the trial date is not affected.

### 1. Data Obtained from Individual Users' Files

Medtronic shall isolate the 300gb of electronic data it has already identified as potentially containing relevant information. Using the vendor of its choice, Medtronic shall search the 300gb of electronic data using the Boolean search terms (or their equivalents, if a proprietary search program is used) attached as Appendix A to this order (the "Keyword Search"). These terms are based on the list provided by Michelson's counsel in his October 11, 2002 letter to Medtronic's counsel. The parties may add, delete, or modify search terms or connectors, but only by mutual agreement or by approval of the special master. No later than May 30, 2003, Medtronic shall produce to Michelson a complete list of the files identified by the search (the "Keyword Search Result List"), along with a list identifying the software application reasonably required to read each type of file.

Medtronic may then conduct additional searches designed to identify privileged information and shall bear the cost of designing and running any privilege searches. Each file identified by a privilege search shall be isolated. Within five (5) days of completing any privilege search, Medtronic shall produce to Michelson a complete list of the files identified by the search (the "Privilege Search Result List"). All privilege searches shall be completed, all search results isolated, and all Privilege Search Result Lists produced to Michelson, not later than June 15, 2003.

Medtronic shall divide the files identified by privilege search into five sections of equal size and immediately begin to review the files in the first section for both privilege and

relevance. Non-responsive files shall be removed from production. Responsive, non-privileged files shall be isolated for review by Michelson. Privileged files shall be recorded on a privilege log. This review shall be complete by June 30, 2003, and Medtronic is instructed to produce to Michelson the privilege log from the first privilege review section by that date.

The parties will then arrange a mutually agreeable time and method for Michelson's review of the responsive, non-privileged files from the first privilege review section in their native electronic formats. Medtronic shall make the files available for Michelson's review no later than July 10, 2003. Medtronic shall be responsible for providing any software application reasonably necessary to Michelson's review.

Michelson, upon review, shall designate the documents he wishes Medtronic to produce. Michelson may choose electronic or paper production. If Michelson elects paper production, he shall pay Medtronic seven cents ($.07) per page. The documents will be Bates-labeled, marked CONFIDENTIAL—ATTORNEYS' EYES ONLY, and delivered at Medtronic's expense. If Michelson elects to have files electronically produced, Medtronic will produce them at its own expense on compact disk (CD). Upon request and at its own expense, Medtronic shall also make available for Michelson's use any unique software applications necessary to read the electronically produced documents.[6] Medtronic will bear the cost of producing the CDs, but Michelson will be responsible for printing any information from the CDs and shall bear the full cost of any such printouts.

Review for the other four privilege sections shall be completed in a like manner and on a rolling basis according to a schedule to be established by the special master, allocating approximately one month for each of the remaining four privilege sections, in order to comply with the November 10, 2003 discovery deadline.

Simultaneously with the privilege review, the keyword search results, other than the privilege search results discussed above, shall also be divided into five sections of equal size. Medtronic shall immediately begin to review the files in the first section for responsiveness and third-party confidentiality. Any non-responsive documents may be removed from production at this time. Documents subject to further processing (such as third-party notification) may be removed from production at this time but shall be recorded in a log (the "Further Processing Log") which log shall be disclosed to Michelson no later than June 30, 2003.

The parties will then arrange a mutually agreeable time and method for Michelson's review of the responsive, non-privileged files from the first section in their native electronic formats. Medtronic shall make the files available for Michelson's review no later than July 10, 2003. As previously stated, upon request, Medtronic shall be responsible for providing any unique software application necessary for Michelson's review.

From this point forward, the review and disclosure process shall duplicate the privilege review procedure outlined above according to the timetable to be established by the special master, with each party bearing the same costs listed above.

All further processing of the files in the Further Processing Logs shall be complete, and the files made available for Michelson's review, by November 10, 2003.

### 2. Data Obtained from Year–End and Current Month Backup Tapes

Medtronic, using the vendor of its choice, will restore fiscal year-end backup tapes from the years 1997 through 2002, plus all backup tapes for the 30 days preceding the date of this order. Medtronic's vendor will (1) extract the data of the 40 individuals identified in Appendix B to this order, (2) search the extracted data using the keywords identified in Appendix A to this order or otherwise agreed upon by the parties or directed by the special master; and (3) de-duplicate the data. All non-duplicate data

---

**6.** If Michelson or his representatives must travel to Medtronic locations for review because the software applications cannot be used off-site, Michelson shall bear the reasonable expense of such travel.

identified by search will be converted to standard images and isolated. No later than June 15, 2003, Medtronic shall produce to Michelson a complete list of the files identified by the backup tape restoration keyword search (the "Backup Tape Keyword Search Result List").

Medtronic has advised the court that its desired vendor is Kroll Ontrack, who will complete the above procedures (restoration, searching, and de-duplicating) on 124 sample tapes for a flat fee of $605,300, or $4,881 per tape. The quote of approximately $4,881 per tape for professional restoration, searching, and de-duplication services appears reasonable. Medtronic shall bear sixty percent (60%) of the costs associated with restoring, initially searching, and de-duplicating the data to this point in the process. Michelson shall bear forty percent (40%) of the costs to this point.

Medtronic may conduct, upon the restored files, any additional electronic search or searches designed to identify privileged information. The files identified by privilege searches shall be isolated. Within five (5) days of completion of any privilege search on the backup tapes, Medtronic shall produce to Michelson a complete list of the files identified by the search (a "Backup Tape Privilege Search Result List.") All privilege searches on the fiscal-year end backup tapes shall be completed, and all Backup Tape Privilege Search Result Lists produced to Michelson, no later than June 15, 2003.

Medtronic shall bear the full cost of privilege searching, including designing and conducting the privilege keyword searches. Upon reasonable notice and at Michelson's request, Medtronic shall cause its vendor to produce an itemized billing indicating which portions of its fee are attributable to designing and conducting privilege keyword searches.

Medtronic shall divide the Backup Tape Privilege Search Result List into five sections of equal size. Medtronic shall review the files in the first section for both privilege and relevance. Non-responsive files shall be removed from production. Responsive, non-privileged files shall be isolated for review by Michelson. Privileged files shall be recorded a privilege log. Medtronic shall complete its privilege review for the first section and produce to Michelson the privilege log for the first section by June 30, 2003.

The parties will then arrange a mutually agreeable time and method for Michelson's review of the relevant, non-privileged files. The files shall be made available for Michelson's review no later than July 10, 2003. Medtronic shall be responsible for providing any software application reasonably necessary to Michelson's review.

Michelson, upon review, shall designate the documents he wishes Medtronic to produce. Michelson may choose electronic or paper production. If Michelson elects paper production, he shall pay Medtronic fifteen cents ($.07) per page. The documents will be Bates-labeled, marked CONFIDENTIAL—ATTORNEYS' EYES ONLY, and delivered at Medtronic's expense. If Michelson elects to have files electronically produced, Medtronic will produce them at its own expense on compact disk (CD) in .tiff format with an associated load file. Medtronic will bear the cost of producing the CDs, but Michelson will be responsible for printing any information from the CDs and shall bear the full cost of any such printouts. Medtronic may, at its option, copy such printouts at its own expense.

Review for the other four backup privilege review sections shall be completed in a like manner and on a rolling basis according to a timeline to be established by the special master, allocating approximately one month for each of the remaining four privilege sections.

Simultaneously with the privilege review, the backup tape keyword search results, other than the backup tapes privilege search results discussed above, shall be divided into five sections of equal size. Medtronic shall immediately begin to review the files in the first section for responsiveness and third-party confidentiality. Any non-responsive documents may be removed from production at this time. Documents subject to further processing (such as third-party notification) may be removed from production at this time but shall be recorded in a log (the "Backup Tape Further Processing Log"), which log

shall be produced to Michelson by June 30, 2003.

The parties will then arrange a mutually agreeable time and method for Michelson's review of the responsive, non-privileged files. The files shall be available for Michelson's review no later than July 10, 2003. From this point forward, the review and disclosure process shall duplicate the privilege procedure above, with each party bearing the same costs as indicated above.

All further processing of the files in the Backup Tape Further Processing Logs shall be complete, and the files made available for Michelson's review, by November 10, 2003.

### 3. Data Obtained from Any Other Backup Tapes

Should Michelson wish to restore and have searches performed on any additional backup tapes, Michelson shall bear the entire cost of restoring the backup tapes, extracting the data of the 40 individuals identified in Appendix B to this order, searching the extracted data using the keywords identified in Appendix A to this order and as otherwise agreed upon by the parties or ordered by the special master, and de-duplicating the data. Michelson shall be responsible for providing any software application necessary to the review.

Medtronic shall then review the selected files for relevance and privilege. For any data produced under this provision and created on or before December 31, 1996, Michelson shall bear the full cost of Medtronic's relevance and privilege review. For any data produced under this provision and created on or between January 1, 1997 and the date of production, Michelson shall bear the full cost of Medtronic's relevance review and fifty percent (50%) percent of the cost of Medtronic's privilege review.

Medtronic shall identify the files that are responsive and non-privileged and make them available to Michelson for review not later than September 30, 2003, at Michelson's sole expense. No later than October 15, 2003, Michelson shall provide Medtronic with a list of the files he wants Medtronic to produce. If Medtronic does not object within five (5) days, Medtronic will produce the files for Michelson in any medium Michelson designates and at Michelson's sole expense. Medtronic may, at its own expense, copy any files so selected, on paper or electronically.

### E. Amendment to Protective Order

The Protective Order in this case, entered October 11, 2002, is amended to provide the following:

Medtronic waives no privilege for documents or subject matter produced through any of the discovery protocols in this order.

The defendants shall immediately notify Medtronic of any document that comes to their attention and appears to be privileged or potentially privileged, including without limitation communications from or to attorneys or legal assistants that were not sent or copied to a non-Danek or non-Medtronic employee or entity. Medtronic shall promptly respond to any such inquiry with an indication of whether privilege is asserted with regard to that document.

All documents produced pursuant to this order shall be designated "Confidential—Attorneys' Eyes Only," subject to existing procedures in the October 11, 2002 protective order for resolving issues surrounding such designations.

Any vendor selected for the backup tape restoration process, and the neutral computer expert, shall be bound by the terms of any and all confidentiality agreements and protective orders now in place, or to be put in place in the future, in this cause. The deliberate or inadvertent disclosure of any document to such an expert or vendor does not waive privilege with regard to that document.

Good cause exists for these amendments because the volume of data that will be produced by electronic discovery will make it difficult for the producing party to identify with certainty every potentially privileged document prior to production.

### CONCLUSION

For the foregoing reasons, the court finds it appropriate to shift some of the electronic discovery cost to Michelson. The parties are

instructed, within five (5) days from the date of this order, to agree on a neutral computer expert, or to provide the court with names of candidates and the designated information, to serve as a special master to oversee discovery. The parties will equally bear the cost of the special master. As soon as the special master is designated, either by the parties or by the court, the above-outlined electronic discovery plan shall commence. Each party shall bear the portions of the electronic discovery costs outlined in this order.